May it please the court, Victor Torres on behalf of Mr. Morales-Morales, your honor. This is a case that happened a long time ago. This happened out in a desolate area to the east of the port of entry in San Isidro at the border. It was midnight and between about 20 to 30 minutes this man was seen crossing the border and was shortly thereafter arrested. And the reason I think that this is a... That's kind of important, what you just said. When was he seen and how shortly after and when was he out of sight? I understand he was out of sight for a good 25 minutes. The evidence at trial was that he was between 10 to 20 minutes. That's substantial by our precedent, isn't it? It's significant, I think. But the issue that I think is before the court is whether or not... I think the primary issue, I'll agree, is whether or not the trial court should have given a jury instruction. This is a situation, in my view, that's almost like a reverse deliberate ignorance situation, like a dual instruction. Here there was an agent. He was 10 to 15 yards east of the port of entry, riding on the access road next to the border. He sees a group of people. He activates his lights. In the cat and mouse game that happens at the border, most of them went back, one guy continues. The agent testified, if I follow him, then everyone else jumps the fence. So they deliberately, although they were able to follow him, they could have probably... He was in a Jeep. He could have chased them down fairly easily. He had a strategic choice to make. Absolutely. And that's because of the situation that we have at the border, where we have sometimes big groups of people and very few patrol agents. That's not the government's fault. And very few patrol agents. Well, neither is it my client's fault. Well, he's part of the group. He was part of the group, but then he separated himself from the group. And I think that that's significant, because they made the decision not to follow him, relying... That your client did vis-a-vis the rest of the members of the group? Yes, the agent that was posted. What's the evidence that your client wasn't the designated diversion while they go off chasing him and all the rest of the group gets across? There's no evidence to that, and I'm not arguing that that's the situation. I'm saying that the government made the decision not to chase him down because of the situation they have. Sure. They're outnumbered. Hide and conquer. They're outnumbered, no question. There were two or three agents in the area, and that's the reason they relied on the seismic sensor. This is not a case, and I think it comes down to, the juxtaposition between the Vela Robles case and Judge Pius's opinion in the bail buy-in decision. Which is replete with lead-up statements, in his opinion with respect to my colleague, of being out of sight for little bits of time, little bits of time. This case, if we were to follow your logic, I'm just putting it out there, because I've done these cases, too, and I appreciate what your position is. I'm just trying to get it on the table. If we were to say that under these circumstances, that someone who has come across the border has been spotted coming across, so it's not a question of there's no dispute as I understand it that he was spotted when he crossed the border. The question is whether he remained under constant surveillance. Your argument is they made a strategic decision to let him go outside their physical vision, but constructively they knew where he had to be under the circumstances. Therefore, being out of sight for 15 to 20 minutes would be okay in terms of constant surveillance because they virtually knew where he was. Isn't that what you're asking us to say? What I'm asking you to decide is that that issue of fact is a jury question. And there's a basis for that in our law, that that would somehow, you can be out of sight for that long, and there's any basis in our law to suggest that's a viable legal defense. Well, in the Bayo Bahena case, they didn't even know, there was no evidence in the record to suggest when he had in fact crossed the border. He was spotted north of the border for the first time by the agent on the scope. In fact, I think the government tried to argue in that case because of that, it was a Vela Robles case where he had been outside of the construction, outside of the constructive restraint of the agents for that period of time. Therefore, it's not an official restraint case. And in this case, we have a number of factors that I think were in the record that gave substantial evidence to allow the court at least, maybe they weren't winners, but certainly it was enough to force the court to instruct. We had the footpaths that were lined with sensors. That's in the record. There were other sensors because of security reasons. They don't want the public to know where the sensors are. But I think it's a rational inference that there are sensors in the area. Certainly, this man could have gone anywhere on some of those footpaths, but the evidence is that this was midnight. He went up onto a hill. There's no light out there. The only light is down on San Isidro Boulevard, which is exactly where the agents went because of the sensor and exactly to the spot where because of his experience in the usual traffic patterns, that's in the record, it was easy to predict where he would go. Again, these are the only lights around that area for miles. But, counsel, what I hear you saying, you're conceding that he could have gone to various locations or taken various paths, but he went to the one of greatest convenience because it was better lit. No. What I'm saying is it would have been what I would have argued had I gotten a jury instruction would have been there was no real way for him to navigate these blind footpaths in the middle of the night with no light. He had to go down towards the light. And for that reason and because of the circumstances, I'm asking the court to take into consideration the totality of these circumstances, the fact that they could have chased him if they wanted to. They could have sent an agent on foot. They could have sent an agent to track him down. They could have sent an agent back on that trail. But it was easier because of the seismic sensors. This is not a case where it was simply the seismic sensor that set off the alarm and somebody went to go investigate. This was because of that sensor, that sensor indicating that the traffic is going down towards Santa Cedar Boulevard where anybody would expect the person to go. Well, you wouldn't expect them to go off into the middle of the night into, I think the government stated in its brief, the inky darkness. You would expect them to go down to the Santa Cedar Boulevard. And that's, in fact, what the agents did. And what the agent testified was the usual traffic pattern where they would, quote, come out of the woods into the light and into the hands of the border patrol officer 500 yards from the border. In effect, what you're arguing in favor of, then, is that a hunch is a sufficient basis to find custody. It's not a hunch. They saw him cross. They saw him, which direction he goes. All they've got to do is wait another couple minutes to see where that sensor goes off. If the sensor goes off into the footpaths, I don't think it's a rational inference that the court can draw or that a jury could have drawn that they would have gone off into the inky darkness to go look for him on the footpaths. Certainly, he's coming down to where the light is. That's the only rational inference in that situation. Let's get back to Bayo Bahena, since you started off with that. You're right. I'm going to have a dober here, first, of whether we have an expert here. No, I'm not an expert on this, by all means. But Judge Fischer is correct. We did talk about constant surveillance. One of the things that was interesting about that case is, you're right, the officer who had the scope didn't actually see Bayo Bahena cross over the border. But he had conversations with another officer. I believe it was Officer Drake. Drake had called him and said, hey, they're heading north. The one officer with the scope said, I don't really know where he first observed Bayo Bahena. At what point? So there was kind of a factual dispute whether or not the officers had seen him continuously from the time he crossed the border until they apprehended him in the bushes. So, under those circumstances, it seemed pretty clear, as the opinion lays out, that Mr. Bayo Bahena's claim that he was under constant surveillance was really a factual dispute that had to go to the jury. Now, here we know that, as Judge Fischer pointed out, that there was a substantial period of time where your client was, how would we say? In the hills. In the hills. In the inky dark. He could have gone to the left. He could have gone to the right. He could have gone wherever he wanted to go. He had freedom to make that choice. And he was not under constant surveillance. So how, you know, I looked at this and I initially kind of thought maybe the district court judge should have given the instruction. But then after I read all the cases, I kind of thought, hmm. You know, our cases do talk about constant surveillance, whether it's, you know, the eyeball or whether it's on a scope or whether it's on radar or something or other. Right. And I agree with you to the point of the, it has to be constant surveillance. And the constant surveillance doesn't even really mean anything unless you have into context what that constant surveillance really encapsulizes. And that's what the court's trying to prevent is to, and the law is trying to prevent is allowing this person to go free at his own will to go wherever he wants. Here he really wasn't. There was only one place for him to go. And that's a factual question. Perhaps there is a dispute that the jury could have decided, well, no, he could have gone anywhere else. He could have gone to the right. He could have gone up the hill. He could have gone into the ocean, I suppose. Let's take the language of Bayo Bahena. I mean, we say, quoting our own president, an alien must be in the visual or physical grasp of the authorities at all times. He was not in the visual or physical grasp at all times. Okay. And it says, but in Bayo Bahena's case, he has pointed to affirmative evidence that he was under continuous visual observation by a border agent for a period of time before his arrest. Continuous visible observation. Now, I'm sitting as a district court in this case, and you come to me and say, well, you know, he was out of constant visual observation for, let's say, 15 minutes, 20 minutes, but they knew constructively where he was, and all they had to do was listen to the censor. Well, I go back to this case, and I say, wait a minute, you know, seismic censor does not amount to observation or surveillance for the purpose of showing official restraint. Where is the guidance in our court that affirmatively indicates in any way that the theory of defense that you're proffering requires the court to submit the fact to the jury? What is the fact that they're supposed to find? I think that's the point I was just trying to make, which is- What's the law against which, what's the law those facts are going to be placed up against? The cases cited talk about this legal fiction of the constructive custody. Although the person is physically in the United States, they're in the constructive custody, and although there is that language in Bayonet that this is how you find that constant surveillance, meaning it has to be constant visual surveillance, there's really no reason for that. Of course there is. Of course there is. You just said it's a legal fiction. They are in official custody, even though they aren't physically in custody because we can watch you, and in that sense you aren't free to move. When you disappear, you are not in any constructive sense, visual or otherwise, in the custody. Now you're taking the fiction to the next level of fiction. He wasn't really free to move. So then he was in the physical grasp. Certainly he could have gone anywhere. Certainly Bayonet could have gone anywhere and gotten out of the constant physical observation of the agent on the scope. It could have happened, but it didn't. Here we have a gentleman who could have done all these things, but that's not a rational inference to be drawn from the- It's a question of fact on whether that's the rational inference and the only rational inference that could be drawn from these facts. He could have gone. So you're relying on the constructive grasp. The court laughed when I said what I said before, but the reason- Laughing in a humorous sense. The reason is because the law is such that it's trying to prevent the person from going free into the society. And here there was no chance for this man to go free into the society unless he took the unreasonable chance of going right up into the hill in the darkness and sitting under a bush all night, supposedly. And I don't think it's reasonable, nor can the government say it's reasonable, for the agents just to say, well, he didn't come out. He must be up there. We'll just wait. What's the evidence that he was- that they could have physically grasped him without much effort? The evidence is that when the agent was sitting- At any time along that path. When the agent was sitting there five to ten yards away from him and turned on the lights and he continued and the rest of the group went back, that's where he could have used the radio. He could have called. And, in fact, he said, that's why I chose to stay there. This also puts the government in the position of having chosen a found-in charge, not having to prove the specific intent of an attempted reentry charge. They chose to do the found-in charge. That gives rise to this defense that perhaps it wasn't the best defense, perhaps it's not a winner with the jury, but at least should have been instructed by the court. And the court certainly shut that down. I even said, if I even mention that to the jury judge, what are you going to do? You're likely to strike my closing. And he said, yes, I think I will. And that gives rise to what the court really tried, I think, to wrestle with. The trial court was trying to wrestle with whether or not this is an attempted reentry or a reentry case. And that's not really what the court needed to decide. What is the proper – and you're – We understand what the theory is. We helped create the jurisprudence. So we have – you've articulated it quite well. What's our standard of review here? The standard of review – For failure to give this instruction. Is the – it's in the Bail Banna case. Use of discretion, isn't it? Use of discretion. Okay. Okay. You're over time, so I think you have your argument. We do appreciate it. Good morning. Kyle Hoffman for the United States. I'd like to make three separate points. One has to do with timing. One has to do with direction. And the third has to do with Bail Banna versus Vela Robles, which is the – I would say the counterpart case in this context. First point about timing, and I believe it was Judge Fischer who raised this initially. The record is very clear of what happened in terms of timing. Agent Martinez, 10 or 20, 30 yards from the San Ysidro point of entry, saw the defendant for 10 seconds. Then the testimony was it was 10 to 15 minutes before the censor was tripped. Okay, so giving the benefit of the doubt, so to speak, of the defendant. There's at least 10 minutes that he's at large over the border. Then the censor's tripped, and then the testimony is very clear. It's 5 to 10 minutes before he's seen by Agent Vial emerging from the darkness out of the hills near San Ysidro border. So to pick up on Judge Fischer's point, and what Judge Benitez actually said and found in the district court, there's a considerable length of time where this defendant is essentially at large over the border and not seen, not in the physical grasp, not in the visual grasp of anyone. Okay, so that's very clear about the timing in the record, and that's 15 minutes. That's giving all the, where there's a decision to make, giving all the benefits to the defendant. It could be as much as 25 minutes. Second point about direction, and I believe Judge Pius, he indicated he could have gone left, he could have gone right. Judge Benitez a couple of times said he could have gone north, he could have gone south, he could have gone east, he could have gone west. And the testimony, it's all over. The assistant United States attorney asked one of the agents, are there other paths once the defendant got over the fence that he could have taken in those hills?  Now, and Mr. Torres, rightfully so, when Judge Benitez asked him this, could he have gone in any direction? Mr. Torres conceded an argument on this matter, yeah, he could have gone in any direction once he got over those hills. Now, this brings me to two points. I think the thrust of Mr. Torres' argument is essentially, look, there's really only one place he could have come out. And so I was entitled to get a jury instruction because he was constructively in the visual or physical grasp of people because everybody knew there was only one place he could come out. I think that's the thrust of the argument. I don't think that's right as a factual matter for the timing issues and for the direction issues that I mentioned. It's also pitch black at night, apparently. Correct. So that limits, although theoretically there might be paths all over in a practical matter. That's the essence of his argument. I think we could – I want to bring up this point about direction. There's paths everywhere on those hills. Now, I tried to – I asked Mr. Torres, I have something by way of a – it amounts to a demonstrative, but I asked the court to take judicial notice of a picture from Google Earth of what this area looks like. And it's essentially to – I hope to help the court. Does the counsel have an objection to that? I do because it's – Okay, fine. That's fine. We don't need to look. That's fine. All I'm trying to suggest is that I would focus on there's paths everywhere and the concession, he could go in any direction. This notion that – and we know, I think we can all know from experience, that in the southwest border districts, undocumented aliens go every which way. Okay, fine. So we got that. Now, we get to the cases, Bayo Bahena and Vela Robles. And Judge Pius, I think, got it exactly right. I suppose ought to have given his involvement with that decision. And the issue there was one agent essentially testified in a way that allowed the inference that he was in the eyeballs, with the assistance of some things, of an agent the entire time. Because the one agent said, well, so-and-so told me he had him in his sights, but I had no idea when he picked him up. And then the notion was, well, the jury could infer that's their province to say whether he picked him up right after he got over the border or whether he got him up later. But at least he's entitled to a jury instruction because of that factual dispute. That was his theory of his case. Right. You have to sort of – Right. But here, going back to the timing point, there's no dispute that there are these at least 10- and 5-minute gaps in time where he's not in anybody's eyeballs. He could be anywhere in those hills. Now, then we go to Velo Robles, which essentially it was very similar to this case. I would suggest the only difference is there's not an eyeball sighting of the defendant when he gets over the fence. What the defendant did in that case was he tripped the sensor about 10 or 15 yards over the border. And then this gets to the thrust of what I think Mr. Torres' argument is. Really, there's a canyon, and there's only one way, the defendant argues, that he can go. So he trips the sensor 10 or 15 yards over the border, and he's in a natural canyon. There's only one way he can go. And this court said, no, you don't get a jury instruction under those circumstances because there's no evidence to support the theory that he was in the constant visual or physical grasp of the border patrol or whoever was charged with finding this particular defendant. So I would suggest really that's the case that Judge Benitez would, in effect, he did rely on, Velo Robles. There isn't evidence, given this timing issue, given this direction issue, that would support that instruction. And so the court did not, and again this gets to Judge Paez, abuse its discretion in denying that request for a jury instruction. That's the proper standard of review, and it was certainly within the court's discretion, given the state of the evidence on this record. So unless there are further questions, I will submit. All right. Thank you. I'll give you a minute if you want to discuss it briefly, Your Honor. The Velo Robles case was a case where there was physical impediments. There was steep escarpments. There was only one way out. I think that's very different than having a situation where the agent sees the defendant cross the border, basically decides to rely on the seismic sensors on which way he's going, and then stationed in radio for an agent to be in the right spot at the right time, where under their experience the foot traffic always comes out. The possibility is... To extend your point, I mean if you have this only one way out canyon, which is what they had in Velo Robles, that's what you're trying to... But there we also had the situation, I'm sorry, there we also had the situation of they weren't sure when he had crossed the border, only that there was a sensor tripped. I think that makes a big difference. Okay. Because that goes to the timing issue. All right. Interesting case, Mr. Torres. Thank you, Your Honor. Thank you for the argument. Thanks both counsel. All right. We stand in recess for the day.
judges: Fisher, Paez, Robart